UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: CASE NO. 25-15015-LMI

OCEAN FIVE CONDOMINIUM
ASSOCIATION, INC.,

Debtor.
_______________________________/

ECF #73, 103, 104, 106, 108, 133,

February 4, 2026

The above-entitled cause came on for hearing before the Honorable Laurel M. Isicoff, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 301 North Miami Ave., Miami, Miami-Dade County, Florida, on February 4, 2026, commencing at or about 9:45 a.m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

APPEARANCES:

CAROL FOX, Subchapter V Trustee

ROBERT C. MEYER, Esquire
On behalf of the Debtor

LAW OFFICE OF MARK S. ROHER, by
MARK ROHER, Esquire
and
MELISSA POMARES, Esquire (via Zoom)
On behalf of Birol Ozyesilpinar
Living Trust Dated May 23, 2011

DAN GOLD, Trial Attorney
Office of the U.S. Trustee
Department of Justice

ALSO PRESENT

ECRO - Electronic Court Reporting Operator

- - - - - - -

INDEX

| WITNESS | DIRECT | CROSS |
| --- | --- | --- |
| Alvin Hagerich | | |
| By Mr. Meyer | 15 | |
| By Mr. Roher | | 19 |
| Carlos Herrera | | |
| By Mr. Meyer | 26 | |
| By Mr. Roher | | -- |

EXHIBITS

| | Page |
| --- | --- |
| Debtor's Exhibit 1 | 12 |
| Debtor's Exhibit 2 | 12 |
| Debtor's Exhibit 3 | 12 |
| Debtor's Exhibit 4 | 12 |
| Debtor's Exhibit 5 | 12 |
| Debtor's Exhibit 6 | 12 |
| Debtor's Exhibit 7 | 12 |
| Debtor's Exhibit 8 | 12 |
| Debtor's Exhibit 9 | 12 |
| Debtor's Exhibit 12 | 12 |
| Debtor's Exhibit 10 (as described) | 22 |
| Creditor's Exhibit 1 | 51 |

THE COURT: All right. The next matter that I have on the calendar is Ocean Five Condominium Association, Inc., 25-15015.

I'll take appearances from the courtroom, and then from the virtual courtroom if needed. Okay, and I do note that our two witnesses are in the virtual courtroom.

So this is the confirmation hearing. Mr. Meyer, please make your appearance.

MR. MEYER: Good morning, your Honor. Robert Meyer here on behalf of the debtor.

THE COURT: Mr. Roher.

MR. ROHER: Good morning, Judge. Mark Roher, R-O-H-E-R, on behalf of the Birol Ozyesilpinar Living Trust, dated May 23rd, 2011, and that's spelled B-I-R-O-L O-Z-Y-E-S-I-L-P-I-N-A-R.

And if it is acceptable to the Court, I'll just refer to my client as the Trust.

THE COURT: I think that's something that we would all appreciate, for all of us doing that.

MR. ROHER: Thank you, Judge.

THE COURT: All right. Thank you.

MS. FOX: Good morning, your Honor. Carol Fox, F-O-X, Subchapter V Trustee.

THE COURT: Okay. Mr. Gold.

MR. GOLD: Good morning again. Dan Gold, G-O-L-D, for the U.S. Trustee.

THE COURT: All right. I see Mr. Hagerich has joined us. Welcome back, Mr. Hagerich, and Ms. Ozzie Silpinar (phonetic), I hope I did not mispronounce your name.

MS. SILPINAR: No, perfect, your Honor. Good morning.

THE COURT: Okay, Mr. Kouri, did you wish to make an appearance?

MR. KOURI: Good morning, your Honor. No, I'm here for another matter.

THE COURT: Oh, okay, well, put up your feet and stay a while.

MR. KOURI: Thank you.

THE COURT: Okay. Anyone else?

(No verbal response.)

THE COURT: No. Okay. All right, Mr. Meyer, we have a variety of things, but all stem from the confirmation.

So did you wish to make any opening statement before you proceed?

MR. MEYER: If I could, please, your Honor.

First, we do have one live witness, but he's on his way. He went to another structure, and his name is

Carlos Herrera, H-E-R-R-E-R-A, and he's the court-appointed bookkeeper for the debtor.

THE COURT: Okay. So are you asking for a brief recess, or what are we doing?

MR. MEYER: I think we could use the witnesses, at least I have Mr. Hagerich to work with as well. So I think if we get through with Mr. Hagerich and some other items, we may have Mr. Herrera present.

THE COURT: I do not have up here your exhibit binder, so --

MR. MEYER: No, we're working off of, Judge, what's in the file, and --

THE COURT: Well, where's your exhibit register?

MR. MEYER: I'm just taking judicial notice of the filings before the Court, Judge.

THE COURT: Okay. This is an evidentiary hearing. It requires an exhibit register. My procedures are very clear.

All right. You need to provide an exhibit register. So, I will handwrite them today, but you will submit one by tomorrow, all right?

MR. MEYER: If you want, I can give you a list of the documents.

THE COURT: Well, you're going to have to,

because what you should have had was a list of all your exhibits on the Court form exhibit register. So, this is not new. This is how every confirmation hearing has been done for the 20 years in front of me that I've been a judge, whether you have your exhibits electronically on the exhibit register, or you have them in a binder, and the actual document for me to mark up.

So, why don't you first identify for me each of the exhibits upon which you are relying, and then we can go through them one by one regarding the admission of the documents.

MR. MEYER: Sure.

THE COURT: Mr. Roher had filed an objection on the basis of your failing to comply with the Local Rule, which objection I overruled, without prejudice to Mr. Roher demonstrating if he has -- can demonstrate some prejudice by virtue of any of the exhibits upon which you are seeking to rely.

So, let's start with Exhibit 1. What's your first exhibit?

MR. MEYER: It'll be a Court Paper 52, Judge.

THE COURT: And which is?

MR. MEYER: The monthly operating report for May.

THE COURT: All right. So the May monthly operating report.

Okay. What else?

MR. MEYER: Next would be Court Paper 69.

THE COURT: 6-9?

MR. MEYER: Correct.

THE COURT: And that would be Exhibit Number 2, and what is that?

MR. MEYER: That's the monthly operating report for June.

THE COURT: Okay, and then next?

MR. MEYER: Court Paper 73.

THE COURT: Which is?

MR. MEYER: The monthly operating report for -- I'm sorry, that's the plan, the amended plan, sorry.

THE COURT: So, the amended plan is 73.

What else?

MR. MEYER: Next would be 84, and that's the monthly operating report for July.

THE COURT: Okay.

MR. MEYER: The next would be Court Paper 85.

THE COURT: Okay.

MR. MEYER: And that's the monthly operating report for August.

THE COURT: All right. Next?

MR. MEYER: Next would be Court Paper 91.

THE COURT: Okay.

MR. MEYER: And that's the monthly operating report for September.

THE COURT: Okay.

MR. MEYER: The next would be Court Paper 98.

THE COURT: Okay.

MR. MEYER: And that's the monthly operating report for October.

THE COURT: All right.

MR. MEYER: The next would be 99.

THE COURT: Okay.

MR. MEYER: And that's the monthly operating report for November.

THE COURT: Okay.

MR. MEYER: The next would be 102.

THE COURT: Okay.

MR. MEYER: That's the monthly operating report for December.

THE COURT: Okay.

MR. MEYER: The next would be 120.

THE COURT: Okay.

MR. MEYER: And that's the affidavit of

Carlos Herrera for confirmation.

THE COURT: Okay.

MR. MEYER: I'm sorry, strike that, Judge. It got refiled, it's 121.

THE COURT: Okay.

MR. MEYER: And lastly would be Court Paper 130.

THE COURT: Okay.

MR. MEYER: And that's the response to the -- hold on, I may be in error here. No, it's not the one, Judge.

119, I'm sorry.

THE COURT: Which is what?

MR. MEYER: The reply to the objection to confirmation.

THE COURT: And how is that a document in support of confirmation?

MR. MEYER: The exhibits attached, you have an appraisal attached and an analysis as well.

THE COURT: Okay. So you're seeking admission of the appraisal and the analysis?

MR. MEYER: Correct.

THE COURT: All right. Let me repeat what I have here.

Marked as Exhibit Number 1 is Docket

Entry 52, which is the May monthly operating report. Marked as Exhibit Number 2 is Docket Number 69, the June monthly operating report. Marked as Exhibit 3 is Number 73, the amended plan. Marked as Number 4 is Docket Entry 84, the July monthly operating report. Marked as Exhibit 5 is Docket Entry 85, the monthly operating report for August. Marked as Number 6 is Docket Entry 91, the monthly operating report for September. Marked as Number 7 is Docket Entry 98, the monthly operating report for October. Marked as Number -- as Exhibit Number 8 is the monthly operating report for November. Marked as Exhibit 9 is Docket Entry 102, the monthly operating report for December. Marked as Exhibit 10 is 121, the affidavit of Carlos Herrera in support of confirmation. Marked as Exhibit 11 is 119, reply with appraisal and analysis.

What about the plan confirmation certificate, did you wish to --

MR. MEYER: Yeah, that's in the file as well, Judge.

THE COURT: Number 12, what is that docket entry number?

MR. MEYER: 122, Judge.

THE COURT: Anything else?

MR. MEYER: That would be it, Judge. The

rest is the testimony.

THE COURT: All right. Skipping over Exhibit Number 10, which is Docket 121, the affidavit of Carlos Herrera, and skipping over Number 11, 119, which is the reply with the appraisal and analysis, is there any objection to the admission of Exhibits 1 through 9 and Exhibit 12? So those are the monthly operating reports, the amended plan, and the plan confirmation certificate. Mr. Roher?

MR. ROHER: No, your Honor.

THE COURT: Okay. Mr. Gold?

MR. GOLD: No objection from me.

THE COURT: All right. Ms. Fox?

(No verbal response.)

THE COURT: All right. So I will admit Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9 and 12.

(Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 12 were admitted into evidence.)

THE COURT: We obviously can't do anything with Mr. Herrera's declaration until he's here.

And let's go to Exhibit 11, which is Docket Entry 119, the reply with the appraisal and the analysis.

All right. Any objection, Mr. Roher?

MR. ROHER: Yes, Judge, hearsay.

THE COURT: Okay. Mr. Gold?

MR. GOLD: No objection.

THE COURT: All right. Ms. Fox?

MS. FOX: Thank you, your Honor. No objection.

THE COURT: Okay. So, Mr. Meyer, the objection to 122 -- I'm sorry, to Exhibit 11, which is Docket Entry 119, is hearsay. What is your response?

MR. MEYER: There is no response to that, Judge.

THE COURT: Okay, then I'll refuse admission.

Okay. So we'll have to wait for Mr. Herrera on the declaration. Which courthouse did he go to? Please don't say Fort Lauderdale.

MR. MEYER: No, the old one.

THE COURT: What?

MR. MEYER: He's within walking distance, but I had to have him go back and put his phone in the car. So we're right now in the dark, we can't communicate with him.

THE COURT: Got it.

Okay. Well, if you had asked permission, we could have -- Ms. Maza would have written a letter that allowed him to bring his phone in, but whatever.

Okay. So, that, you'll get a correct

exhibit register uploaded tomorrow.

So, where would you like to go from here?

MR. MEYER: If I can, Judge, I think putting Mr. Hagerich on the stand.

THE COURT: Okay. All right. Mr. Hagerich, if you'll please raise your right hand. Are you ready?

Do you affirm that all the testimony you are about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth? This do you affirm under the pains and penalties of perjury?

MR. HAGERICH: I do.

Thereupon,

ALVIN HAGERICH,

having been first duly sworn, was examined and testified as follows:

THE COURT: All right. So, Mr. Hagerich, are you alone?

THE WITNESS: Yes, I am.

THE COURT: All right. Do you have any electronics that are open, other than the device that you are using to testify?

THE WITNESS: I have my computer, but that's not on. This is on my phone. I can turn my computer off.

THE COURT: Okay. Does your computer have the documents that you're going to be looking at to

testify?

THE WITNESS: It does.

THE COURT: All right. Well, then that probably would not be a good idea. Okay. So, as long as you don't have it connected in a way that you can communicate with anybody.

THE WITNESS: No, I'm on the phone for the Zoom.

THE COURT: Okay. All right. So the witness is sworn, so please proceed with your direct.

DIRECT EXAMINATION

BY MR. MEYER:

Q. For the record, could you state your full name?

A. Alvin Lewis Hagerich.

Q. And with whom are you employed?

A. I'm employed by Alvin L. Hagerich, PA, Professional Corporation.

Q. And what do you do for a living?

A. I'm a CPA. I do tax returns. I work with bankruptcy trustees and Chapter 11 debtors.

Q. And how long have you worked with trustees and Chapter 11 debtors in bankruptcy?

A. I've been doing it since before I was a CPA, so that was in 1990, so about 36 years.

Q. And are you appointed by the Court in this case?

A. I am.

Q. And what are your duties in this case?

A. In this case, I prepared monthly operating reports, and I assisted with the liquidation analysis and the budget for the 60 months.

Q. And in preparing the monthly operating reports, what documents did you review?

A. The bank statements.

Q. And when you prepared the monthly operating reports, did you discuss the entries with anyone else?

A. When I first started, I was working with Carlos Herrera, and he would tell me what things were, and then after I got familiar with his operations, the expenses were fairly similar month to month, so I didn't reach out as much to him after as the case progressed.

Q. Did Mr. Herrera ever give you anything like a profit and loss or a monthly report?

A. Yeah, I did get, like, a general ledger printout with financial statements.

Q. And you said you helped in the projections, which are attached to the plan. What documents did you review before preparing the projections?

A. I worked with him, I looked at his general

ledgers and P&L statements that he prepared, and a lot of discussion with him.

Q. And how long, approximately, did it take for you to prepare the projection?

A. It took quite a while, because we had to go back and forth because he wanted the projections to be similar to what they do for their association. So it took a little longer than I expected.

Q. Can you give an idea in time, what "quite a while" means?

A. I could look at my fee application and tell you, or my time sheets.

MR. ROHER: Your Honor?

THE COURT: Yes.

MR. ROHER: I'm not sure why this is relevant. Maybe this will speed it along.

THE COURT: Okay. Why is this relevant, Mr. Meyer? Because it is taking a while.

MR. MEYER: I was just hoping that we'd have an estimation of how much effort was put into making the projections, Judge.

THE WITNESS: It's about 15 hours, 15 to 20 hours.

BY MR. MEYER:

Q. And is it a fair statement to say that you

essentially take the general ledger, or the profit and loss statements, and convert them into a monthly operating report?

A. My monthly operating report was similar in dollar value to what was in his P&L statements, pretty consistent, I would say.

Q. And are the monthly operating reports truthful and accurate to the best of your knowledge?

A. They are.

Q. And is the projection attached to the plan truthful and accurate to the best of your knowledge?

A. It is.

MR. MEYER: I have no further questions, Judge.

THE COURT: Okay. I believe, is that Mr. Herrera?

MR. HERRERA: Yes, I am.

THE COURT: Okay. Welcome, sir. Just pull up a chair over next to your lawyer.

Okay. Mr. Roher, did you have any cross-examination for Mr. Hagerich?

MR. ROHER: Yes, just a few questions.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. ROHER:

Q. Good morning, Mr. Hagerich.
A. Good morning.
Q. Just a couple questions.
Did you ever see any type of parking revenue? Revenue from parking?
A. Not that I'm aware of.
Q. Did you ever discuss -- I'm sorry, you can finish your answer.
A. It wasn't separately stated on the bank statements that I could tell.
Q. Do you know if the debtor had or has had any parking revenue since the bankruptcy case was filed?
A. This is the first I'm hearing of it.
Q. Okay. What about special assessment income, I'm looking at the plan projections, and there's zeros for every year, 2025, '26, '27, '28, '29, '30.
Do you know why that number -- those numbers are all zeros?
A. We discussed that the rates were going to go up according to the plan every year. We didn't discuss the special assessment.
Q. Are you aware that the debtor has the ability to impose special assessments?
A. That's pretty normal with HOAs.
Q. Right. So do you know why their -- I guess

my better -- do you know why there are no special assessments provided for under this plan projection?

A. We projected the fees out. We didn't project any special assessments.

Q. Would you agree that special assessments could be imposed to pay some or all of my client's claim?

A. They could, but that wasn't what we discussed.

MR. ROHER: Okay. Thank you.

Nothing further.

THE COURT: All right. Thank you. Any redirect, Mr. Meyer?

Oh, I'm sorry, Mr. Gold, did you wish to cross-examine Mr. Hagerich? I apologize.

MR. GOLD: I do not.

THE COURT: All right. Ms. Fox, did you wish to cross-examine Mr. Hagerich?

MS. FOX: No, your Honor.

THE COURT: Okay. I'm sorry.

Now, any redirect?

MR. MEYER: No redirect, Judge.

THE COURT: All right. Thank you so much, Mr. Hagerich.

MR. HAGERICH: Thank you.

THE COURT: You can keep -- if you want,

it's totally up to you, but you can turn your camera off until we get to your fee app if you want, okay?

MR. HAGERICH: Thank you.

THE COURT: All right. Mr. Herrera is now here, so now we will circle back to Mr. Herrera's declaration, which is Exhibit 11 -- marked as Exhibit 11. No, sorry, Exhibit 10.

Subject to the right of cross-examination, any objection to the admission of Exhibit 10, Mr. Roher?

MR. ROHER: I'm going to object just to Paragraph 15, 16, and 17.

THE COURT: Give me a moment.

What would be the basis?

MR. ROHER: It's a legal conclusion. I'm sorry, they are legal conclusions.

THE COURT: All right. Hold on. Let me pull up the declaration.

MR. ROHER: 14 as well, I'm sorry, Judge.

THE COURT: Okay. Your response, Mr. Meyer.

MR. MEYER: Okay. As to Paragraph 14, that's not a legal conclusion, that's a payment calculation.

THE COURT: And as to 15?

MR. MEYER: That, again, I don't think you need to have a legal mind to understand the concept of

good faith, and that's what is being expressed there.

THE COURT: All right. 16.

MR. MEYER: That, again, is a concept of math, not a concept of law.

THE COURT: All right. 17.

MR. MEYER: That, again, is a concept of math, not a concept of law.

THE COURT: Okay. Mr. Gold, any objection to Exhibit 10?

MR. GOLD: No, your Honor.

THE COURT: All right. Ms. Fox?

MS. FOX: None from me, your Honor.

THE COURT: All right. I'm going to sustain the objection as to Paragraph 17, and overrule the objection as to 14, 15, and 16.

So, Exhibit Number 10 will be admitted except for Paragraph 17.

(Exhibit 10 was admitted into evidence as described.)

THE COURT: That is, of course, without prejudice to your, Mr. Meyer, putting Mr. Herrera on the stand if you would like, and adding anything you wish, whether it's to suss out the facts underlying that statement in Paragraph 17, as to why Mr. Herrera believes that the case would not be followed by a liquidation, and

then we'll tender Mr. Herrera for cross-examination, okay.

MR. MEYER: I appreciate it.

THE COURT: Okay. So, Mr. Herrera -- did you wish to do that, to add --

MR. MEYER: Yes.

THE COURT: Okay. So, Mr. Herrera, if you'll please come forward, the court security officer will help you open the door.

ECRO: Please raise your right hand.

THE COURT: Remain standing, sir. Mr. Herrera, remain standing. Please raise your right hand.

ECRO: Do you solemnly affirm that the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. HERRERA: I do.

ECRO: You may be seated.

Thereupon,

CARLOS HERRERA,

having been first duly sworn, was examined and testified as follows:

THE COURT: Okay. All right. So, Mr. Herrera, have you ever testified in court before?

THE WITNESS: No.

THE COURT: Okay. So, first of all, if you don't know the answer to something, nothing is going to happen, nothing is going to fall out of the ceiling. Okay, so it's okay.

All right. Just -- second, when Mr. Meyer is questioning you, and then when I -- when Mr. Roher, if he chooses to cross-examine, or Mr. Gold, or Ms. Fox, please wait until they finish their question before you answer, because the recording can only pick up one voice at a time.

Also, you might be wrong and, you know, be answering a question which is not the question that is being answered -- being asked.

Okay, and also, when Mr. Meyer is questioning you, you need to give Mr. Roher, Mr. Gold, or Ms. Fox the opportunity to object. Okay. So, that's the third reason why you wait until the question is finished, and then when any of them is questioning you, for Mr. Meyer to object, and then for me to rule on the objection.

Conversely, anyone questioning you is not going to interrupt your answer, unless you start going on and on, and someone might interrupt and say, objection, your Honor, you know, whatever, but other than that, they are not going -- they are going to let you finish your

answer before they go on to the next question, okay?

THE WITNESS: Okay.

THE COURT: All right. With that, Mr. Meyer, please supplement the declaration in the manner that you feel is necessary to finish proving what you need to prove through Mr. Herrera.

MR. MEYER: It's very peculiar here, you have to lean right and look forward.

DIRECT EXAMINATION

BY MR. MEYER:

Q. For the record, could you state your full name?

A. Carlos Herrera.

Q. And with whom are you presently employed?

A. Blue Sky Miami Management Company.

THE COURT: All right, and, I'm sorry, Mr. Herrera, one more thing. You see that microphone, you can bring it closer to you. You can even move it. It moves, so you can --

THE WITNESS: Okay.

THE COURT: Well, you move, it moves, so you can move the stand closer to you. It's not glued to that top. So, see, you can pick it up.

MR. MEYER: I think the first time you talked it was really loud.

THE COURT: What?
Okay. Go ahead.
BY MR. MEYER:
Q. And what is your business relationship, or the company's business relationship with the debtor?
A. We are the management company for the association.
Q. And have you been authorized by the association to sign the plan and be here today?
A. Yes.
Q. And what matters do you or your business handle for the debtor?
A. General repair and maintenance and bookkeeping.
Q. And does your bookkeeping or management involve day-to-day payment of expenses?
A. Yes.
Q. And when you handle this management and bookkeeping, do you make monthly profit and loss statements?
A. Yes.
Q. And other than the bank statements, what documents do you look at to make the monthly profit and loss statements?
A. Can you repeat the question?

Q. Okay. When you prepare the monthly profit and loss statements, do you look to documents other than the bank statements?
A. Correct.
Q. Anything else?
A. Invoices, vendor invoices.
Q. And did you share the profit and loss statements with Mr. Hagerich in preparing the monthly operating reports?
A. I do.
Q. And I saw in the schedules he had a reserve account. Could you explain to the Court what the reserve account was for?
A. The reserve account, there are two types of reserves, the traditional and the mandatory by Florida Statute, which is called SIRS, S-I-R-S, and the purpose is to start putting money aside for future capital expenditures.
Q. Okay. As we stand and sit here today, are there any impending matters requiring funds from the association regarding capital improvements?
A. Yes.
Q. Okay, and what would those be?
A. The association has a need for about $675,000 for building repairs, necessary building repairs.

Q. Okay, and what would those repairs include?
A. To my knowledge, they need to replace the roof immediately to avoid the windstorm policy cancellation, that's going to be about $250,000. They also need to do the pool, another 150. Stucco and paint, that will be another 150 plus 75, and because the association doesn't have any money, they're going to have to find the money to pay about 40 -- $50,000 for the windstorm premium.
Q. Okay, and how will the association finance this 600 to $725,000 debt?
A. Most likely, because it's a large amount for 16 units, they're going to have to get a bank loan, and then special assess the owners to pay installments.
Q. And with such a special assessment for 600 to $725,000, how much more on average would the unit owners pay monthly?
A. For the 2026 budget, the lowest is $1,400, the highest $4,000 for the bigger units.
Q. That's what they're paying now, but with the special assessment, we're talking about for the 600 to 725,000, how much more would they have to pay?
A. Estimating that the association is going to pay back that loan in three years, we're talking about an average between, the lowest 835, to 2,400 every month.

MR. ROHER: Your Honor?
THE COURT: Yes, what's your objection?
MR. ROHER: Objection, it appears the witness is reading off of something.
THE WITNESS: Numbers.
THE COURT: Okay. Would you like to see what the witness is looking at?
MR. ROHER: I'd like to -- yes, Judge, I'd like to at least know what he is --
THE COURT: Okay. Well, he just said he was looking at numbers.
Would you like to go over with Mr. Meyer and look at what the witness is looking at?
MR. ROHER: Briefly, Judge.
THE COURT: Okay. So, Mr. Meyer and Mr. Roher, you can go over and look at what Mr. Herrera is looking at, okay? It looks like numbers.
MR. ROHER: Okay. Thank you, Judge.
THE COURT: Okay. All right. Please continue, Mr. Herrera.
MR. MEYER: So I just want to make sure the record is clear. So is it the present payment of about $1.4 thousand going to be raised to 2.2 or 2.3 thousand for the special assessment for the smallest unit?
A. That would be about right, yeah, if they

decide to pay back in three years, yes.

Q. Okay, and the bigger units will pay 4,000 on the regular assessment, and --

THE COURT: Can you get closer to the microphone? I'm sorry. And, again, you can move the microphone. It moves, subject only to the black wire holding it -- plugging it in.

BY MR. MEYER:

Q. And the larger units would have a present $4,000 increase, to about $6,400 a month, based upon that special assessment?

A. Yes.

Q. As to the creditor that's here today objecting to the plan, has that creditor been paying monthly dues to the association?

A. No.

Q. And between the time of the default by that creditor, to the time of the bankruptcy filing, in May of 2025, approximately how much was owed for the creditor's unit for association dues?

A. Before the bankruptcy, the prepetition, I believe it is?

Q. Correct.

A. It's 21,000.

Q. And since the filing of the bankruptcy to

present, how much has not been paid by the creditor to the association for dues?

A. It's an additional 27,000.

Q. And in 2026, how much approximately does the creditor owe the association on a monthly basis?

A. Starting in January, the monthly HOA fee is 2,500, and that's the number going forward.

Q. Okay. Has the association ever considered a special assessment to pay the creditor?

A. Yes.

Q. And did the association vote to approve or not approve a special assessment to pay the debtor?

A. No.

Q. And so the association did or did not vote? Did they have a review?

A. They did not vote. I'm sorry, they voted not to do a special assessment, yeah.

Q. Thank you.

Were you involved with Mr. Hagerich in preparing the monthly operating reports?

A. Yes.

Q. And what documents did the two of you review in preparing the monthly operating reports?

A. Every month I provided him with the bank statements, and the general ledger detail report, and the

monthly financials.

Q. And were you involved with Mr. Hagerich in preparing the projections for the plan?

A. When he asked a question -- yes, yes, yes.

Q. Okay, and what documents did you review of Mr. Hagerich in preparing the projections?

A. The historical financials and the projections, the future expenditures.

Q. How long have you been working as a manager of condominium associations?

A. Over 10 years.

Q. Approximately how many condominiums do you or your business handle each year?

A. Each year we have 22 clients.

Q. Has anyone on the board told you the reason they voted against the special assessment to pay the creditor?

MR. ROHER: Objection, hearsay.

THE COURT: Sustained.

BY MR. MEYER:

Q. Were you at the meeting when the board determined not to pay the special assessment to the creditor?

A. Yes.

Q. And what was the reason they decided not to

pay this?

MR. ROHER: The same objection, Judge.

THE COURT: Overruled.

THE WITNESS: Because of this capital expenditure for 675, there are urgent repairs to be done. That's going to be unaffordable for owners to pay the special assessment and the ongoing HOAs.

MR. MEYER: I have no further questions, Judge.

THE COURT: All right. Give me one moment.

Okay. Mr. Roher, would you like to cross-examine Mr. Herrera?

MR. ROHER: I would, Judge.

THE COURT: Okay.

MR. ROHER: I'm just trying to figure out if there's any exhibits, any of the debtor's exhibits for Mr. Herrera to look at.

THE COURT: No, apparently not.

Do you know how to use the electronic system for the Court?

MR. ROHER: Do you have -- would you have that? I just, I think really I need to focus on the plan projection.

THE COURT: Okay. Well, I don't know how to do it. My law clerk is not here.

Mr. Meyer, do you have a copy of the projections with you, since you were supposed to have isolated -- oh, Ms. Fox has a copy of the projections.

MR. ROHER: It's really just --

THE COURT: Okay.

MR. ROHER: -- I believe, the one page, at Docket 73, the plan projection.

THE COURT: Okay. Well, Ms. Fox is very kindly offering to -- oh, wait, wait, we've got, like, a plethora, like a flood.

Okay, but the problem is the witness needs to look at it. So, Ms. Fox may be -- oh, wait, Mr. Gold knows how to do it.

MR. ROHER: I might be able to.

THE COURT: Well, no, Mr. Gold is doing it for you. This is, like, full service Office of the U.S. Trustee, both Mr. Meyer and Mr. --

MR. ROHER: I'm glad there's no shutdown.

MR. GOLD: I mean, without plugging it in, I don't know how to make it show up for the witness, though.

THE COURT: Well, Ms. Fox -- okay, how about this, Ms. Fox has a hard copy that she's going to give the witness.

MR. GOLD: That's even better.

MR. ROHER: I mean, yeah.

THE COURT: And then we can all look at the -- oh, my goodness, this is getting more exciting by the moment.

MR. ROHER: Okay.

UNIDENTIFIED: Voila.

THE COURT: Thank you, Nestor.

Okay. The court security officer is handing the witness the protection. This is why we have rules. Okay.

MR. ROHER: Can you see that, Judge?

THE COURT: I'm going to pull mine up from my docket. I think that's going to be safer for me. Which plan -- the plan is --

MR. ROHER: It's Docket 73, and it's Page 18 of --

THE COURT: 18. Okay. Docket 73. Hold on.

Okay. I have it. Okay. Which line and which -- what do you want, Mr. -- well, now, Mr. Gold gave you his computer, so now he doesn't have a copy.

Perhaps you can look over Ms. Fox's shoulders, and she's got hers up on her screen.

Okay. What line, what question do you want to ask the witness, Mr. Roher?

MR. ROHER: I'd like to just make some -- make sure I understand.

BY MR. ROHER:
Q. It's Canberra?
A. Herrera.
Q. I'm sorry.
A. That's fine.
Q. Herrera. Good morning, Mr. Herrera.
A. Good morning.
Q. All right. So you're looking at Exhibit A to Docket Entry 73, correct? It says Page 18 --
A. Yes.
Q. -- of 20?
A. Yes.
Q. Can you tell me what that is?
A. These are the five-year projection that was prepared in early 2025, I believe.
Q. Okay, and did you assist in the preparation of that?
A. I did.
Q. Okay. Now, you testified earlier about a $675,000 capital expenditure for building repairs for the roof, 250,000; the pool, 150,000; paint, 225,000, and $50,000 for, I guess, wind premium insurance, is that correct?
A. That is correct.
Q. So can you tell me where that 675,000

appears on this?
A. The only number that is going to be part of this projection is the wind insurance. Everything else is a capital expenditure.
Q. But why is it not on the projection if it's going to be an expense?
A. Because usually that's what you have reserves for. So the reserve monies are intended to pay for these future capital expenditures, but sometimes these overrun costs does not allow to pay in full for these building repairs.
Q. Okay, but that doesn't really answer my question, because if these are projections for five years, and I'm assuming, although I hate to assume, but I'm assuming that the 675,000 --
THE COURT: You need to talk to a microphone.
MR. ROHER: I'm sorry.
BY MR. ROHER:
Q. I'm assuming the 675,000 is going to be an expense within the next five years, right?
A. The $675,000, it came as a sudden emergency repair because of the roof. If the roof is not replaced immediately, actually it's due in June, the windstorm policy will be canceled.

Q. So would you not agree that this Exhibit A, the projections is not accurate?
A. It was not known at that time this emergence -- of this emergency --
Q. I know, but today we're at the confirmation.
THE COURT: I'm going to remind you, Mr. Roher --
MR. ROHER: I'm sorry.
THE COURT: -- don't interrupt him.
MR. ROHER: I'm sorry.
THE COURT: Okay.
MR. ROHER: I'm sorry.
THE WITNESS: Yes.
THE COURT: Are you done with your answer, Mr. Herrera?
THE WITNESS: No, this was projected in early 2025, all these 675 was unknown, and then, again, the windstorm policy, the premium, it's part of the operating expense, it's already included. It's an estimate, obviously. That's it.
BY MR. ROHER:
Q. With regards to the windstorm, what line item is that?
A. 5105, the account number is in numerical order.

Q. I see that.
A. Yeah.
Q. So, there's -- would you not agree that there's missing from the other -- the other expenses are not on the projections, correct?
A. Correct.
Q. Okay. So, the roof -- and the roof has to be repaired when?
A. Before June.
Q. So that's 250,000, right?
THE COURT: Back in the microphone, Mr. Roher.
MR. ROHER: I'm sorry.
BY MR. ROHER:
Q. That's 200 -- sorry. That's 250,000, correct?
A. Correct.
Q. And that has to be paid in year one?
A. The roof cost, it has to be ASAP.
Q. And when did you find out about this --
A. We receive from Citizens Insurance Company, we receive a notice of nonrenewal because of the age of the roof recently.
Q. When was that?
A. I cannot recall, but sometime, you know, in

early January or so, or maybe December.
Q. So, within the last few months.
A. Yeah.
Q. Why was -- do you know why this projection wasn't updated to include that?
A. These projections were done in early 2025, and I don't think we have been updating this number ever since.
Q. The plan, this amended plan was filed, and you can see at the top, on September 12th, 2025, correct?
A. Yes.
Q. But you think -- I don't -- I'm sorry. Your testimony is that these numbers and projections were compiled in early 2025?
A. Yes, sometime in early 2025.
Q. So these projections are about a year old, is that correct?
A. I would say about that, yeah.
Q. And then the pool expense for 150,000, that's also not listed in these projections, correct?
A. Correct.
Q. The paint expense for 225,000, that's not listed either, correct?
A. Correct.
Q. So wouldn't you agree that these projections

are no longer accurate?

A. They're no longer accurate, but also this is an operating budget. An operating budget is meant to be for regular operating expenses.

Q. So are you saying that you don't think this budget needs to be corrected, or projections --

A. I'm just --

Q. -- I'm sorry?

A. I'm just saying that this is an operating budget, what the association is looking to spend in a year, when it comes to regular operating expenses.

Q. You testified earlier that you were at the meeting where there was a vote to consider making a special assessment to pay my client's claim, is that correct?

A. Yes.

Q. Do you know when that was?

A. I don't recall. I mean, I have so many meetings every day. I would have to look it up. But it was, you know, this month, yeah. I mean, not this month, February. I mean, January.

Q. It was in January?

A. Yeah.

Q. Do you remember the outcome of the vote?

A. Yes.

Q. Can you tell the Court?
A. No special assessment.
Q. Zero across the board?
A. Zero across the board.
Q. Do you know if my client was invited to that meeting?
A. I don't -- if she was, I don't recall. I don't know, I don't know.
Q. But she wasn't there.
A. I don't know.
Q. You said you were there, though?
A. I was there, but I don't take rolls, so I don't know who was on the call.
Q. It was a call?
A. I mean, it was a meeting --
Q. Like a Zoom?
A. -- online meeting.
Q. It was, like, a Zoom meeting?
A. Yeah.
Q. Okay. Do you know how many people were on that meeting?
A. No.
Q. Okay. You state in your affidavit that the plan has been proposed in good faith, and not by any means forbidden by law. Do you agree with that statement?

A. I do.

THE COURT: I just -- oh, I'm, sorry, I apologize.

MR. ROHER: You don't have to apologize.

THE COURT: Ignore me, ignore me.

MR. ROHER: I'm the one that usually --

THE COURT: I mean, don't ignore me, but ignore that.

MR. ROHER: I'm the one that usually apologizes to you, Judge. That's the way it usually works.

THE COURT: Okay. I'm sorry, repeat the question, Mr. Roher.

MR. ROHER: Just for the record, I think it was just 17 you --

THE COURT: Right.

MR. ROHER: -- sustained.

THE COURT: Exactly.

MR. ROHER: Yes.

THE COURT: Right.

MR. ROHER: I wanted to ask him about that, but --

THE COURT: All right. Okay.

BY MR. ROHER:

Q. I'll repeat.

So in Paragraph 15 of your affidavit, you say the presented plan has been proposed in good faith, and not by any means forbidden by law. Do you agree still with that statement?
A. Repeat that again.
Q. Your affidavit of Paragraph 15 states that the presented plan has been proposed in good faith, and not by any means forbidden by law?
A. I agree.
Q. But you would agree that the debtor has the ability to impose special assessments, correct?
A. Ability, yes, because we need it for the building repairs.
Q. Correct.
And the debtor also has the ability to impose a special assessment of some amount to pay some or all of my client's claim?
A. By "ability", you mean financial ability?
Q. Yes.
A. No, they don't have the financial ability to special assess to pay, other than these building repairs.
Q. What is that -- what is your answer based on?
A. The financial ability?
Q. Yes.

A. That the HOA is already extremely high, and with these building repairs, you're talking about more HOA fees.

Q. But how -- what did you do to determine that there would be no ability to pay any of my client's claim through a special assessment?

A. Because any lender will only lend money for building repairs, nothing else.

Q. And how do you know that?

A. Because I'm in the industry, and I get bank loans from many banks, many lenders, and I know the requirements which, you know, they're deferred from bank to bank, but in general, unless it is for a building project, building repairs, they will not lend you the money.

Q. I understand.

So can I assume that this $675,000 loan, it's going to be secured by the real estate, or by the common area?

A. In the industry, property management industry or condominium association, the collateral is always the receivables, nothing else.

Q. And where are the receivables listed on the projections?

A. So the way it works is once you get approved

for a bank loan, and you get the proceeds from the bank, the board, by that time, needs to adopt or approve a special assessment to the owners to be able to pay back the loan. So those new receivables is the collateral for the bank.

Q. So you have a lot of experience in the property management?

A. Over 10 years, yes.

Q. Okay. What's your background?

A. Accountant.

Q. Okay. Where did you graduate from?

A. FAU and FIU.

Q. It must get confusing.

A. Well, yeah.

Q. So based on your experience, and based on your, you know, knowledge and day-to-day workings, the special assessment -- a special assessment can be done -- is able to be done to fund these building repairs, there's a procedure in place, I guess a vote or whatever.

A. Yeah.

Q. And I guess -- and I think you've testified, I don't want to put words in your mouth, and please correct me, there was a procedure, there was a vote where repaying my client through a special assessment was considered, and was denied.

Do you know how many votes are needed to be cast?

A. The majority.

Q. And is it a simple majority?

A. A simple majority, yeah.

Q. So I guess there's 16 unit owners, but my client, I don't think participated, so there's 15, so there had to be at least eight, correct?

A. Correct.

Q. Okay, but you would agree that it's possible for a special assessment to pay for my client's claim, correct?

MR. MEYER: Objection, he's asking a hypothetical, Judge.

THE COURT: Okay. I'm going to sustain the objection, but on the basis that the horse has been beaten --

MR. ROHER: Okay.

THE COURT: -- okay?

MR. ROHER: Yes.

THE COURT: I have an 11 o'clock calendar, which obviously is going to be a problem, but --

MR. ROHER: I understand.

THE COURT: -- I think it's not fair to unnecessarily -- you've asked your question, you've gotten

your answer, and you did actually already ask the question that you just asked.

MR. ROHER: Okay. I will move on.

THE COURT: Okay. Thank you.

BY MR. ROHER:

Q. Do you know if the debtor association receives any income from parking?

A. To my knowledge, that activity has nothing to do with the association. It's a separate business.

Q. Can you explain that, please?

A. Then again, to my knowledge, that business is totally separate from the association. It has nothing to do with the association.

In fact, the association should be paying for the valet parking, but it's not.

Q. Do you know who receives the income from the parking?

A. I believe it's the hotel side.

Q. The parking that's being utilized, is that the hotel parking spaces, or is that the debtor parking spaces?

A. The hotel.

Q. How many parking spaces does the debtor have?

A. I don't know.

THE COURT: Did you want to retrieve your laptop, Mr. Gold?

Thank you for making it available.

MR. ROHER: Thank you.

THE COURT: All right. Let's see if we can undo the screen share so it's -- okay. Here we go, we're back.

Okay. All right. Any other questions, Mr. Roher?

MR. ROHER: Yes. I believe the Trust Exhibit 1, there's no objection, is the declaration of condominium of Ocean Five Condominium.

MR. MEYER: I have no objection, but it might be easier to slim it down to the pertinent pages, because it's a large document.

MR. ROHER: Well, I'm doing that, Judge, but just in general, and what I uploaded --

THE COURT: Well, wait, wait, wait, wait, wait, wait. Now, you want to introduce documents?

MR. ROHER: Yes, just through him, yes.

THE COURT: Okay, but it was -- you were going to move to strike his failure to produce documents, but you didn't bother doing your own exhibit register?

MR. ROHER: I did, Judge.

THE COURT: Okay, then where is it?

MR. ROHER: I uploaded it last night.
THE COURT: Oh, last night, and did you advise my law clerk or my courtroom deputy that you did that?
MR. ROHER: I don't think so.
THE COURT: Okay. All right. Well, this is just a party of people not complying with my rules.
Okay. All right. So, you've uploaded two documents. I see it here, and you have an exhibit register.
Okay. So, you are seeking admission of -- or are you seeking admission, or is it just marked for identification?
MR. ROHER: Admission of Exhibit 1, the Trust Exhibit 1, which is the declaration of condominium of Ocean Five Condominium.
THE COURT: Okay. Mr. Meyer, any objection?
MR. MEYER: Not to Number 1, but again, I'd say --
THE COURT: All right. Creditor --
MR. ROHER: But I have --
THE COURT: -- Exhibit 1.
MR. ROHER: -- slimmed down pages.
THE COURT: All right. Show the pages to Mr. Meyer before you show them to the witness.

MR. MEYER: (Inaudible.)
THE COURT: What?
MR. MEYER: I have -- there's two pages.
MR. ROHER: I did that before, so I did something right, Judge.
THE COURT: Okay, and for my purposes --
MR. ROHER: Yes.
THE COURT: -- since I will be pulling it up on the screen --
MR. ROHER: Yes.
THE COURT: -- what am I looking at?
MR. ROHER: The first is going to be Page 35 of 77.
THE COURT: All right. Hold on.
MR. ROHER: It's like a --
THE COURT: Just hold on, let me get it. 35 of 77. Okay. Go ahead.
MR. ROHER: May I approach the witness?
THE COURT: Yes, you may.
All right. So I'm going to admit Creditor's Exhibit 1.
(Creditor's Exhibit 1 was admitted into evidence.)
THE COURT: Okay. So we're looking at Page 35 of 77. Ask your -- why are you standing up? Do

you have an objection?

MR. MEYER: No, no objection, Judge. I just forgot to sit down.

THE COURT: Oh, okay. No, no, I just -- I'm trying to look at the exhibit, look at you, look at the witness.

Mr. Roher, ask your question.

MR. ROHER: Thank you, Judge.

BY MR. ROHER:

Q. Can you tell me what you're looking at in terms of the drawing?

A. It looks like a parking map.

Q. For Ocean Five, correct?

A. I don't know the building physically. I'm an accountant. I don't have to get involved with actual physical stuff. So if this is the parking lot for Ocean Five, then it is what it is, I guess.

Q. It appears that there's 40 spaces there, correct?

A. By the number, it says 40, up to 40, yes.

THE COURT: Can I ask you, before we go any further, what is the purpose of this questioning? The witness has already stated that the income is for the valet for the hotel, that's what this witness knows.

So I want to know why we're spending time on

how many parking spaces there are. If the issue was whether there was income from parking, you have your answer from this witness.

MR. ROHER: Yes.

THE COURT: So why are we doing this?

MR. ROHER: I was just going to ask, like, one question, Judge.

BY MR. ROHER:

Q. I was going to ask -- I was just going to ask if these are all -- if any of these are hotel spaces, or are they all condo spaces?

A. I wouldn't know. I don't know the building.

MR. ROHER: Okay.

THE COURT: Anything else?

MR. ROHER: Just a few questions, Judge.

BY MR. ROHER:

Q. Did anyone ask you to update the projections based on the new capital expenditures that are required?

A. No.

MR. ROHER: Nothing further.

THE COURT: Okay. Thank you.

Mr. Gold, did you wish to cross-examine the witness?

MR. GOLD: No.

THE COURT: Ms. Fox, did you wish to

cross-examine the witness?

MS. FOX: I do not.

THE COURT: Okay. Any redirect, Mr. Meyer?

MR. MEYER: No, your Honor.

THE COURT: Okay. Mr. Herrera, thank you very much. You may step down.

MR. HERRERA: Thank you.

THE COURT: All right. Mr. Meyer, what other evidence do you have in support of confirmation?

MR. MEYER: We rest, Judge.

THE COURT: Okay. So now we'll get to the objections. So, Mr. Roher, you have an objection to confirmation. I've reviewed it. Did you have anything additional you wanted to argue?

MR. ROHER: No, Judge. I was considering calling my client as a witness.

THE COURT: You can stand up. Because people can see you better if you're there, because if you're there, then you're sort of hidden from the camera.

Okay. Go ahead.

MR. ROHER: I was considering calling my client to testify.

THE COURT: Your client is a trust.

MR. ROHER: Well --

THE COURT: The principal of your client?

And what would your client be -- the principal be testifying to?

MR. ROHER: With regards to the background of the case, with regards to the parking revenue that she believes is being generated and -- but before I go on, I'd like to, if I could, take a very small break and talk to my client.

THE COURT: Okay. We're going to take -- it's 10:51. We'll take a break till 11:00, but then I may take the 11 o'clock matters, because I think they're going to go quickly, and then circle back to this thing. So, why don't we do that, we'll take a break until -- is 10 minutes enough? It has to be enough. I'll give you five.

MR. ROHER: No, it's fine.

THE COURT: I can give you five.

MR. ROHER: Five is fine, too, Judge.

THE COURT: Five minutes. It's 10:51, 10:56 we'll come back, okay?

MR. ROHER: I'll set my chronograph.

THE COURT: There you go.

MR. ROHER: I should get to use it for something.

THE COURT: All right. Go, go, go.

MR. MEYER: You confused me again, Judge.

Is it 10:56 or 11:56?
THE COURT: 10:56, 10:56.
(A recess was had, after which the following proceedings were had:)
THE COURT: Okay. Mr. Roher.
MR. ROHER: Yes, my client would like to testify. So I'll --
THE COURT: What -- I'm thrilled that she wants to testify.
Why don't you tell me what you plan on having her testify about, and I will let you know if I will let her testify. Because I'm not -- we're not here just to have expositions. We don't have time for that.
So if you tell me exactly what testimony you propose to put on, then I will determine whether I believe it is relevant to what I need to consider today, and then when you tell me what testimony you want to put on, you can explain to me why you believe it is relevant, before I -- and I'll also hear from Mr. Meyer, but we don't have time for just airing of, you know, unhappiness.
I'm completely familiar with the litigation. I've reviewed all the pleadings that have been put on docket. I think you know, Mr. Roher, that I review everything. So I know the background. Whether I understand it, in terms of the jury verdict and the

judge's rulings, was there a jury, I know that was yesterday's case. Anyway, yes, there was a jury verdict, yes. It's not relevant. I'm very familiar with all of that, okay?

So tell me what your client representative plans to testify about and why it's relevant.

MR. ROHER: Yes, talking about the parking spaces, Judge, that she -- that my client representative believes that the parking revenue should be part of the debtor's revenue that hasn't been disclosed.

THE COURT: Okay, and this is based on actual knowledge, or is it based on speculation?

MR. ROHER: She will testify that she has personally paid cash to park in the spaces, and she believes that the parking revenue and cash should be the debtor's revenue, and has not been booked as any type of revenue for the debtor.

THE COURT: Should be based on what, that your client has actual knowledge that the money is going to the debtor?

MR. ROHER: Yes.

THE COURT: You're sure that that's what she's going to testify to?

MR. ROHER: Well, she's nodding, Judge.

THE COURT: Well, I'm not looking at her.

I'm looking at you.

MR. ROHER: But that's my understanding.

THE COURT: Okay, and then what else would your client testify to?

MR. ROHER: Just the overall lack of good faith, in terms of not trying to deal with my client, in terms of repaying the debt, basically filing this bankruptcy case solely to extinguish her claim, without any good faith basis to try to repay any portion of the claim.

THE COURT: And why do I need her testimony for that? Why isn't that just argument?

MR. ROHER: Well, she has personal knowledge of the lack of effort to deal with her, or work with her in terms of trying to get any type of resolution, other than what's been proposed.

THE COURT: I will allow brief testimony as to that.

MR. ROHER: Judge, I literally have, like, maybe 20 questions.

THE COURT: Okay. All right. Well, we're going to take a break now and go to the 11 o'clock. If you all want to -- I'm not going to make them wait.

MR. ROHER: I understand, Judge.

THE COURT: So if you all want to take a

brief break while I do my 11 o'clock calendar, you can do that.

We're going to have to work through lunch, I apologize, but that's the best I can do. I've got too many other people, okay?

MR. ROHER: I understand, and I did --

THE COURT: I mean, it's not a criticism, Mr. Roher.

MR. ROHER: No, no.

THE COURT: I just want to make sure that we keep it focused on what we need to accomplish today.

MR. ROHER: Yes, Judge, and I did tell my client that when she answers, to please try to be as brief as possible because you have a very busy docket.

THE COURT: Well, it's not only that. It's just that this is not a time to re-air out grievances.

If there's -- if your client has testimony about -- to demonstrate that the debtor has not demonstrated good faith, in terms of negotiations, I'll hear about it, okay.

MR. ROHER: Okay.

THE COURT: Okay. All right. So we're going to take a brief break. Well, maybe a 30-minute break from the confirmation hearing, and we will go to the 11 o'clock calendar, and I'll just -- we'll run through

them.

(Other matters were heard, after which the following proceedings were had:)

THE COURT: Okay. Ocean Five folks, you just need to give me five minutes.

MR. ROHER: I have some good news, I think.

THE COURT: Oh, I love good news. I'll wait, I'll wait to take my five-minute break.

MR. ROHER: I think --

THE COURT: I'll wait to take my five-minute break.

MR. ROHER: Yes, I think you'd like to hear this, Judge.

I literally just found out during the break -- again, Mark Roher for the debtors.

THE COURT: Okay.

MR. ROHER: I literally just found out during the break that there's potentially D&O coverage that could cover my client's claim, and if that's the case, and we can get the issues worked out, which Mr. Meyer indicated preliminarily that he thinks that some of the issues can be worked out to allow that to proceed, that if everything works out, it could result in a consensual plan.

But with that, Judge, I would suggest that

we continue confirmation for a brief period of time, I'm not trying to delay things, and it could hopefully be consensual at that point. If the issues are worked out, that would allow my client to pursue that policy --

THE COURT: Okay.

MR. ROHER: -- in state court, which I think is great, actually.

THE COURT: I have an irreverent comment that my son used to say, he says, don't threaten me with a good time.

MR. ROHER: You know what, when he said something before, I thought that's what you were going to say, but it's very promising.

THE COURT: Did I say that? Did I really say that?

MR. ROHER: You've said that before.

THE COURT: You think you've heard me say that.

MR. ROHER: I've heard you say that.

THE COURT: Okay. Let me hear from everyone else. Thank you, Mr. Roher.

Mr. Meyer.

MR. MEYER: This case has been pending since May, and the party that just texted or emailed them or called them has known about this since the judgment way

back in the day, and I'm trying, I'm desperately trying, Judge, to hang up my cleats and call it a day. This is my 42nd year of practicing bankruptcy law.

THE COURT: No, I know. Look, right, I'm right there.

MR. MEYER: This literally is my --

THE COURT: We graduated law school together, I got it. No, actually, I graduated before you, I get it.

MR. MEYER: It's a very personal, and maybe --

THE COURT: Okay, but besides banging your head against the wall outside, and hopefully you didn't leave a dent, because the judiciary doesn't have a budget, so this person is associated with the condo association?

MR. MEYER: She owns a unit, she got a judgment against the association, and the issue that they're talking about is not something that shouldn't have been known previously. But the bottom line is, I don't do insurance, but one thing I do understand in insurance is that you need damages.

THE COURT: Right.

MR. MEYER: Right now she has a 500,000-plus judgment.

THE COURT: Right.

MR. MEYER: Until this is confirmed, I don't think she has damages, knowing there's a shortfall between what that judgment amount says and what's being paid in this plan. I think the confirmation actually will help her in her quest.

THE COURT: Okay, but the bottom line is there may be D&O coverage.

MR. MEYER: That's what I've been told, I don't know. They were telling us, I'm here --

THE COURT: Who's "they"?

MR. MEYER: There's a personal injury attorney that handled the defense in that lawsuit against my client.

THE COURT: All right. Ms. Fox --

MR. MEYER: They apparently know more than I do. I do not know --

THE COURT: Okay, but do you have an objection to a brief continuance?

MR. MEYER: How brief?

Judge, I'm done. I'm really -- if it's a week, yeah, I can go for a week.

THE COURT: I don't know. I just want to find out, otherwise, you're ready to proceed today?

MR. MEYER: I'd like to get it over with, let's put it that way.

THE COURT: Okay. All right. Let me hear from Ms. Fox.

MS. FOX: Your Honor, the pronoun "they" is Sutton Law Firm, and that firm called me yesterday at 4:30, just asking what was going on today, and I told them, and how to appear, and I told them that too, and -- but they're not here now.

And, you know, my thought at that late juncture was, we'll go ahead, proceed with confirmation. Yes, I knew that coming in, although nothing was confirmed, the limits of the policy aren't confirmed, but I agree with Mr. Meyer that we should just continue with confirmation, and if the plan needs to be amended, so be it.

But I don't think that the debtor really benefits by a continuance at this point. Everybody's prepared and ready to go.

THE COURT: Yes. I don't have any dates until late March. So it's got to be today. It's got to be today.

So what I'm going to do is, now it's 11:40, and I know that we're running late, but I apologize. At the time this was scheduled, I don't think anyone anticipated that this would go for as long as it did, and it's not a criticism of anybody except myself.

So I'm going to take a five-minute break so my staff and I can stretch our legs, okay? And then we will -- so that's -- now it's 11:41, I'm still taking a full five minutes. So five minutes, we'll come back. You can call your client's principal.

Again, I just want to make very clear, actual knowledge, limited to your allegations of lack of good faith, like, what your principal's personal knowledge or testimony regarding what you're saying is no effort to work anything out, et cetera, and then we'll continue, and then if you have any rebuttal, Mr. Meyer, you'll put that on, and then we'll go to a final argument on whether the plan should be confirmed.

What we could do is, we could do fee apps by Zoom maybe next week, if you all don't want to stay here any longer, we could do that, if we get to confir -- you know, if I confirm the plan. So I'm just throwing that out there as an option that you can discuss while I take my break.

Okay. Thank you.

(A recess was had, after which the following proceedings were had:)

THE COURT: All right. Thank you. Please be seated.

MR. ROHER: Yes, Judge. I think we are very

close to getting this resolved. I just need to make one more phone call.

THE COURT: Okay. I will give you five more minutes?

MR. ROHER: Yes, please.

THE COURT: Works for me.

MR. ROHER: Thank you.

THE COURT: Thank you.

MR. ROHER: I'm sorry to make you get up and down.

(A recess was had, after which the following proceedings were had:)

THE COURT: Thank you. Please be seated.

It looks like everybody was arisen anyway because they were all looking at something.

MR. ROHER: Yes.

Well, I'm pleased to announce, Judge, that --

THE COURT: All right. Say your name for the record.

MR. ROHER: My name for the record.

THE COURT: Well, because --

(Laughter.)

THE COURT: Everybody loves a you-know-what. Okay.

MR. ROHER: Yes.

THE COURT: No, so that the video -- if somebody has to transcribe it they know who is speaking.

MR. ROHER: I try to do exactly what you say, Judge, at all times.

Mark Roher, R-O-H-E-R, for the Trust.

I'm pleased to announce that we are going to withdraw the objection to confirmation.

THE COURT: Okay.

MR. ROHER: And allow it to proceed, and on the condition, which I believe is okay with debtor's counsel, that the following language is in the confirmation order, if I could please read into the record?

THE COURT: Go ahead.

MR. ROHER: The Bisor (sic) --

THE COURT: Just say the Trust.

MR. ROHER: The Trust, yes. The Trust is granted relief from stay and/or nothing in these proceedings or plan impairs the Trust's right to prosecute an independent claim against Ocean Five, its officers and directors for negligence and breach of contract as insurance coverage has been identified. Insurance counsel is involved in a pending appeal in the 3rd DCA representing Ocean Five, and it --

THE COURT: Is that qualified -- I just want to make sure that I understand. Is that qualified, that to the extent that there's insurance coverage? So, in other words, is Ocean Five -- I just want to make sure I understand, because I may or may not approve it, the language you read seems to sound like Ocean Five is agreeing that, not withstanding the plan, that they would continue to be liable for the full amount, or are you -- and also subject -- and there's no one here representing the officers and directors, so nobody can agree on their behalf.

If what you're saying is that the language says that nothing in the confirmation of the plan is intended to or shall impact the Trust's right to proceed against any insurance that may be in place with respect to the recovery, or however you define the claim, the judgment, because I guess the judgment is somewhat different than the claim, if that's what you're saying, then I have no problem.

But I -- one, if you're saying that there's an agreement that your client can continue, can proceed personally against the officers and directors, I can't approve that without someone being here representing them, personally. If you're saying against the insurance proceeds, then I don't care.

MR. ROHER: Yes, I believe it's against the insurance proceeds only.

Actually, the -- one of the attorneys is actually on Zoom, Judge, if you'd -- if we can maybe have her clarify, but I believe the intention is to proceed only against the --

THE COURT: Insurance proceeds?

MR. ROHER: -- insurance.

THE COURT: All right. Is that Ms. Pomares?

All right. Ms. Pomares --

MS. POMARES: Good afternoon.

THE COURT: Am I saying your name correctly, ma'am?

MS. POMARES: It's fine, Pomares, but yes.

THE COURT: Pomares, all right, Ms. Pomares, if you'll make your appearance, please.

MS. POMARES: Yes. Melissa Pomares, on behalf of the Birol Ozyesilpinar Trust, not in these proceedings, in other proceedings.

THE COURT: Okay. Okay. Thank you.

All right. So, Ms. Pomares -- Pomares, okay, I said it right this time, right?

MS. POMARES: Yes.

THE COURT: Okay. Much easier than Ms. Ozyesilpinar. Close, right? Sort of close.

MS. POMARES: I've learned to say that as well.

THE COURT: Okay. So, you're -- Mr. Roher was inviting you to comment, so, in terms of clarifying.

MS. POMARES: Judge, I'm fine with the language that you articulated. I know that -- I understand your, where you're coming from, but I think as long as it says that nothing in the plan or in these proceedings shall in any way impact the client's ability to proceed in any way against the insurance, I think that that's good enough.

THE COURT: Okay. So, any applicable D&O insurance, that nothing in the plan or confirmation order is intended to or shall impact the Trust's right to proceed against any applicable D&O insurance?

MS. POMARES: Correct.

THE COURT: Okay, or available D&O insurance, or whatever. Some -- oh, I didn't turn my camera on, sorry, I'm a disembodied voice. Sorry about that, and now my camera doesn't want to turn on.

Okay. Let's see. Oh, there we go. Okay. All right. Thank you for that clarification, I appreciate that. Thank you.

MS. POMARES: Of course. Thank you.

MR. ROHER: Thank you.

THE COURT: All right.

MR. ROHER: With that language to be included, the Trust is withdrawing its objection.

THE COURT: All right. Well, let me confirm with the debtor, the Subchapter V Trustee and the U.S. Trustee.

Okay. Mr. Meyer, is that a compromise acceptable to you?

MR. MEYER: Yes, your Honor. You saw me stand up, I was having the same concern you did. As long as they limit the recovery to the D&O policy and nothing else, then we have no objection.

THE COURT: Okay. Mr. Gold.

MR. GOLD: Given the clarification that Mr. Meyer just made, which I agree with, I have no objection.

THE COURT: All right. Ms. Fox.

MS. FOX: Just from the accounting perspective, your Honor, no double-dipping. So, if -- in the plan there's a provision to pay the Trust, I think $10,500 per year. So to the extent that that's covered by insurance, it shouldn't be paid by the plan. Otherwise, I have no objection.

THE COURT: Okay. So what you're saying is it should further clarify that to the extent that the

Trust recovers the full amount of its claim or anything -- I mean, I know Ms. Pomares, and Mr. Roher, and Mr. Meyer can work on this, but if the recovery -- if the Trust recovers the full amount of its claim, or an amount that would -- how about this -- you all figure it out, but the point is if the amount was less than the full amount, but it was more that dipped into the 53,000, that the payment by the debtor would be reduced to that amount.

So let's say, is it now a $500,000 claim, you said, because there was a remitter?

MR. MEYER: 500 and change. We're paying $50,000 in the plan, and if they recover more than the $50,000, I think the language would say anything, the first $50,000 should be reimbursed to the debtor estate, and thereafter, the remainder goes to the creditor from the D&O policy. That's the double-dip you're talking about.

THE COURT: No, I think it's the opposite, Mr. Meyer, it's the opposite.

If the debtor -- let's just use 500,000 because my brain can't work. Maybe 45 years ago I could still do this in my head, but -- so let's say the claim is 500,000, just to make it easy, and the debtor recovers $450,000, then the -- I'm sorry, the Trust recovered 450, then the estate would still be paying 50, but if the Trust

recovered 475, then the estate would only be responsible for 25.

So, for any -- whatever -- however you all express that --

MR. ROHER: I understand that math, okay.

THE COURT: Okay. So, in other words, once the -- the Trust can't recover more than it's entitled to. So, for every -- so --

MR. MEYER: Anything over the judgment amount, if they get that, which I don't care what the calculation is --

THE COURT: Well, it's not the --

MR. MEYER: -- we'll get back to the estate.

THE COURT: It's not the judgment amount, it's -- well, or give it back to the estate if the estate has already paid it.

I'm confident that Mr. Roher, Ms. Pomares, and you, Mr. Meyer, and Ms. Fox can massage the math language, okay?

MR. MEYER: I understand.

THE COURT: Okay, and I'm assuming, Ms. Pomares and Mr. Roher, that's fine, the Trust isn't going to get more than it's entitled to.

MR. ROHER: Yeah, I can't imagine a double recovery or an extra recovery.

THE COURT: Okay. So the objection is withdrawn. Okay. Thank you. Thank you very much.

All right. So, now -- but you still need to confirm the plan. So make your request.

MR. MEYER: Yeah, I make my request, Judge. If you look to the elements that would be required under 1129(a), we believe we met --

THE COURT: Well, 1191 --

MR. MEYER: No, I'm going under 1129(a) because it's incorporated by 11--

THE COURT: 91.

MR. MEYER: -- 91(b).

THE COURT: Okay. Got it.

Well, it's not -- if the objection is withdrawn --

MR. MEYER: Right.

THE COURT: -- then it's 1191(a).

MR. MEYER: I have a withdrawn objection, but I don't have --

THE COURT: Oh, a vote in favor.

MR. MEYER: -- an acceptance.

THE COURT: Right, right. Okay. You're right. All right.

MR. ROHER: Judge, if it makes it easier for me to make an ore tenus acceptance, if it makes it easier

for anyone, I'm fine with that.

THE COURT: Okay.

MR. MEYER: I appreciate it, that makes life easier here, too.

THE COURT: Well, let's see what Mr. Gold says. The rules are actually going to be changed to allow that.

MR. GOLD: Yeah, I was going to say, the perspective rule will allow compromises that allow you to change your vote. As we stand here today, I don't know that that's the law.

THE COURT: I'm feeling 105.

MR. GOLD: Yeah, I'm not going to tell the parties here that the trustee needs to stay on to make distributions when the parties agree that may not be necessary.

THE COURT: Okay. Well, how about we do 1191(a), but with my making findings consistent with 1191(b) also, if and as needed, so that there's no issue. Because I know, Mr. Meyer, you want to go off and grow that horrific beard that you had during COVID again.

MR. MEYER: It took me 50 years to be able to grow a beard.

If you want, I can go down to 1129(a) versions, there's really only about eight that apply to

us.

THE COURT: Go ahead.

MR. MEYER: Okay. The first is that the plan is code compliant, and we have not heard any objection. We have actually the testimony that it is, that's 1129(a)(1).

1129(a)(2) is that the debtor is code compliant, excuse me, and we believe that has been handled by testimony as well.

1129(a)(3), that it's filed in good faith. You have the testimony as well, is we believe the plan was filed in good faith based upon all the statements contained therein.

Sections (4), (5) and (6) don't apply to the case at hand.

The most important was the 1129(a)(7), which is the liquidation analysis, and we went through some great detail on that, basically saying the 50,000 being delivered is greater than the liquidation value.

In addition to that, if you look at my response to the objection to confirmation, I went through two different liquidation analyses, and it was -- really, if you use the math, between the recovery against this party, plus the lack -- or the inevitable lack of full payment of the claim, it's more like $100,000 that this

particular creditor would have lost had it gone into a Chapter 7 liquidation.

1129(a)(8) is not included under 1191(b).

1129(a)(9), is we're paying all the administratives, and that is what is required therein. 1129(a)(10) also does not apply in pursuant to 1191(b).

1129(a)(11) is that we're likely not to refile based upon what we've had occur here today, and that's the importance to that.

1129(a)(12) is that we pay the administrative expenses. I filed a certificate that we had the funds in our trust account to pay the fees apps, as they were filed last week.

1129(a)(13) doesn't apply, nor does (14), and 1129(a)(15) also is excepted under 1191(b).

THE COURT: Well, the debtor is also not an individual.

MR. MEYER: Right, and it also applies to (14), which is for DSO judgments, and 1129(a)(16) does not apply here because there's no property being transferred.

So based upon all that, and the testimony that you received today, we assert that this case is ready for confirmation.

THE COURT: Well, if I'm going to make findings under 1191(b), the issue is fair and equitable,

right?

MR. MEYER: Right.

THE COURT: Okay, and I understand that that objection has been withdrawn, so -- but I'll make the finding in any event.

Okay. What else?

MR. MEYER: I think that took care of it, because I went through the litany there, and the fair and equitable you also had in the testimony today by the client's representative, as well as in the affidavit.

THE COURT: All right. Mr. Roher?

MR. ROHER: No objection, Judge.

THE COURT: Mr. Gold?

MR. GOLD: No objection.

THE COURT: Ms. Fox?

MS. FOX: No objection.

THE COURT: All right. I'm going to go ahead and I'm going to confirm the plan. Although the objection has been withdrawn, and the creditor who voted no has now changed their vote orally, and under those circumstances, the confirmation is appropriate under 1191(a), but to the extent that my superpowers, notwithstanding, because the rule has not yet been changed, and oral changes to votes is not recognized, I will also find that the plan is confirmable under 1191(b).

And with respect to the fair and equitable argument, although it has been withdrawn, I just want to make a statement that the evidence shows that the -- and I did review the case that you cited, Mr. Roher. Again, I note your objection has been withdrawn, but the case that was cited in that case, the debtor chose to meet its obligations by making a special assessment, but based on the testimony of Mr. Herrera -- well, first of all, there's nothing in the case that suggested that a condominium association or an HOA had to pay unsecured debt by a special assessment, but more importantly -- hold on -- more importantly, in this case there's evidence that shows that this debtor now has this obligation that it must borrow this money, and that the special assessment powers, although they may or may not authorize, and I have the condo docs in evidence now, even though we didn't go through all of them, they are in evidence, but although it may authorize a special assessment for something other than special reserves, that there is this humongous special assessment coming out, and we're talking about a 16-unit association, where only 15 unit owners are actually making payments.

But in any event, so I find that it is appropriate to confirm the plan under both 1191(a) and 1191(b).

I also approve the compromise that has been announced in court, as clarified and massaged, I'll call it that way, meaning that nothing in the plan or the confirmation order shall -- is intended to or shall impede the rights of the Trust to pursue any available D&O coverage, and then put in that mathematical formula that I'm not even going to attempt to try to describe again, but Ms. Fox is in charge of that language, okay?

And so I know this has been a long road, and I know you came in late, Mr. Roher, but I know that Ms. Fox, and Mr. Meyer, and your predecessor counsel did work to try to come to a resolution.

I don't recall when you came in, so I'm sure that you also worked hard. Sometimes things don't work out, but in any event, I'm glad that for everybody's sake, including the Trust, that you can now move on, so -- at least in part.

So I will ask you, Mr. Meyer, to prepare the order, get the language that you need to get with Ms. Fox's help. Of course, run it by Mr. Roher and Ms. Pomares and Mr. Gold, and then upload it for my signature. You also owe me an exhibit register.

All right. So let's quickly go through the applications for compensation. Let's start with Mr. Hagerich, ECF 103. Will you be presenting that,

Mr. Meyer, or is Mr. Hagerich going to?

MR. MEYER: I know he did -- excuse me. I know he did call in to appear for his fee app. I don't know if we --

THE COURT: Well, Mr. Hagerich is there. He may have, like, given up and gone, stepped away, thrown his hands up in the air. So we'll skip over Mr. Hagerich for a minute in case he comes back. So let's --

MR. HAGERICH: I'm here.

THE COURT: Oh, there you are. Okay. Mr. Hagerich, do you still want to get paid, and do you want Mr. Meyer to present your application, or do you want to do it?

MR. HAGERICH: I'd prefer Mr. Meyer do it.

THE COURT: Okay. Mr. Meyer, take it away.

MR. MEYER: Judge, he was instrumental. These MORs had to be done, and without Mr. Hagerich, it would not have been done.

We actually had to ask everybody locally that represented the debtor prior to the bankruptcy, and they all could not do it, and we reviewed his fee. We have absolutely no objection to the fee. It's very reasonable.

THE COURT: All right. Mr. Roher?

MR. ROHER: No objection.

THE COURT: All right. Ms. Fox?

MS. FOX: No objection, your Honor.

THE COURT: Mr. Gold?

MR. GOLD: None from me, your Honor.

THE COURT: I have reviewed the application. I find that it is more than reasonable. I mean, the bottom line is that we, in the industry, so to speak, look at, you know, monthly operating reports and say, oh, well, you just need to fill in this, and you just need to fill in that, but it isn't as simple as it looks, and there are people that are intimidated by that, are concerned that they're going to make mistakes. So the debtor was very lucky to get the -- to get the support and the assistance of Mr. Hagerich in this case.

So I will approve the application in full. I don't have a supplemental application. I just want to make sure I'm not missing anything.

MR. HAGERICH: I did not submit one.

THE COURT: Okay. All right. Well, it's approved in full.

Thank you very much for your help, and thank you for your patience today, Mr. Hagerich. And, Mr. Meyer, you will prepare that order?

MR. MEYER: I will.

THE COURT: All right. Thank you.

MR. HAGERICH: Thank you.

THE COURT: Okay. Thank you again.

All right. The next matter I'm going to go to is Ms. Fox's application, which is ECF 106. Ms. Fox.

MS. FOX: Yes, your Honor, my fee application is filed at Docket Entry 106. I'm seeking actual fees in the amount of $7,131, and estimated fees, through the day of confirmation, of $1,350, for a total of $8,481, actual expenses of $20.41, estimated expenses of $50, for total expenses of $70.41, and a total award of $8,551.41.

Just to represent to the Court what my activities were during the case, I -- basically in response to, when Mr. Koroglu was representing the Trust, I investigated a number of allegations, which included reconstructing the debtors' prepetition bank activity for the one year preceding the petition date.

I then used that work to test feasibility of the debtor's plan. So, in addition to responding to the Trust inquiries, it actually served a two-fold purpose of being a baseboard for -- or a benchmark for the projections that were included in the amended plan. I shared that work with Mr. Gold, and/or also with Mr. Koroglu, and the rest is just the stuff that I needed -- that I'm required to do.

THE COURT: I understand. I reviewed the application.

Mr. Meyer, does the debtor have any objection?

MR. MEYER: No objection, your Honor.

THE COURT: Mr. Roher?

MR. ROHER: No, Judge.

THE COURT: Mr. Gold?

MR. GOLD: I'm going to come up to the podium for this one.

Not only do I not have an objection, and I know I say this in every case where Ms. Fox serves, but I can't quantify how much she's not charging the estate for here. I imagine it's significant.

I put Ms. Fox through her paces, as well as the parties, and as always she was extraordinary. So, you know, if there were something I could do to, you know, encourage a Subchapter V Trustee to seeking an enhancement, which I know is not approved under the code, I would say this case would be an exception, but she's been amazing in this case and, you know, invaluable, certainly to me, I think also, you know, to the debtor, perhaps less so to Mr. Roher's client, but I think at the end of the day, no complaints from the universal point of view here.

THE COURT: All right. Thank you very much, Mr. Gold.

MS. FOX: Thank you.

THE COURT: All right. So, Ms. Fox, I've reviewed your application, and as always, you provide a tremendous service to the debtors --

MS. FOX: Thank you.

THE COURT: -- and the creditors that you serve in the Subchapter V arena. So thank you very much for everything.

MS. FOX: Thank you.

THE COURT: And I approve your application in full.

MS. FOX: Okay. Thank you. I'll upload in order. Thank you.

THE COURT: All right. Thank you.

All right. The next is Blue Sky. Mr. Meyer.

MR. MEYER: And so this one is Mr. Herrera's, Judge. He was the man on call. What you said about Ms. Fox, basically, he had the same thing on the debtor's side, and he helped Mr. Hagerich put together all those DIPs and MORs and projections, and it's a very modest fee that we see here. So we have no objection, and we endorse it fully.

THE COURT: All right. Mr. Roher, any objection?

MR. ROHER: No, Judge.

THE COURT: Mr. Gold?

MR. GOLD: No objection, your Honor.

THE COURT: Ms. Fox?

MS. FOX: No, your Honor.

THE COURT: All right. So I'm going to approve this in full. Obviously, Mr. Herrera, we did not meet before today, but it was clear, based on your testimony, and the testimony of Mr. Hagerich, that you've put in a great deal of time into this client. Property management is always a joy -- and you're standing in my way, Mr. Meyer, so scoot over so that I can look at Mr. Herrera when I'm talking about him -- and of course, when something goes into bankruptcy, it makes it even harder, and then, of course, when it's a contested bankruptcy, which some of them are, and there's nothing wrong with that, I mean, it is what it is, it makes it even harder. So thank you for all of your hard work, and I'll approve it in full.

Okay. All right. So, Mr. Meyer, you'll prepare that order as well.

MR. MEYER: Will do.

THE COURT: All right, and last but not

least.

MR. MEYER: Yes, Judge, we do have a supplement. The total amount of fees between the two is 22,207.

THE COURT: I thought I saw a third one.

MR. MEYER: Only two for me.

THE COURT: Oh, two, okay.

MR. MEYER: And the total amount of costs are $2,243.35.

THE COURT: All right. Hold on. Two thousand two hundred and what?

MR. MEYER: Forty-three dollars and thirty-five cents.

THE COURT: Okay.

MR. MEYER: So with those two, I think we're going at a very reasonable rate, I'm a 42-year veteran, only charging $450 an hour, and a lot of things involved in this case, I don't need to research and review based upon my elderly status, because there's a lot of things you just happen to know when you get old, and we're asking for the combined, between them, approximately $24,450.35.

THE COURT: All right. Mr. Roher?

MR. ROHER: No objection.

THE COURT: All right. Ms. Fox?

MS. FOX: No objection, your Honor.

THE COURT: Mr. Gold?

MR. GOLD: Absolutely no objection.

THE COURT: All right. Mr. Meyer, I reviewed your application, but I've also seen firsthand how hard you have worked to try to get this case to where it is today. I congratulate you, even though I'm very annoyed about your exhibit register, but I'll forgive you, since you're almost as old as I am, but ask you to get it on docket.

And I think that in some parts this became, I don't want to call it a labor of love, but one in which you felt that you wanted to make sure you saw this to the end, and so I hope that the association appreciates, and that the homeowners appreciate the hard work that you did, and so I will approve your application in full, both with respect to the primary and to the supplement, and all of the expenses that you request.

I apologize, it's been a long morning for all of us, I do not remember if you have a retainer. Do you have a retainer?

MR. MEYER: We do.

THE COURT: All right, then I'll authorize application of the retainer, and then the balance to be paid in accordance with the applications, okay?

MR. MEYER: Will do.

THE COURT: All right, and please prepare that order.

I want to thank you all very much, and I also want to thank you for your patience.

I apologize, again, that I had to give you a break, but it turns out that perhaps that was good, right? So you all take care. Have a great day, and court will reconvene tomorrow morning at 10:30.

Thank you.

MR. MEYER: Thank you, Judge.

(Thereupon, the hearing was concluded.)

## CERTIFICATION

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

WITNESS my hand this 8th day of March, 2026.

______________________________

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #HH 715336
December 27, 2029